FILED
United States Court of Appeals
Tenth Circuit

March 19, 2009

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOHN NICHOLAS, individually and
as successor in interest to the Estate of
Demetrios John Nicholas; BRENDA
NICHOLAS, individually and as
successor in interest to the Estate of
Demetrios John Nicholas,

       Plaintiffs - Appellants,

    v.

RICHARD M. BOYD; ROBERT
ALLEN; HAROLD CHEUVRONT;
ROBERT FRANCISCO,

       Defendants - Appellees.

No. 07-1444

(D. Colorado)

(D.C. No. 1:05-CV-02064-REB-MEH)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **LUCERO**, and **MURPHY**, Circuit Judges.

## I.    Introduction

Plaintiffs-appellants John and Brenda Nicholas initiated this action

pursuant to 42 U.S.C. § 1983, asserting a violation of their right of access to the

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

courts. Defendants-appellees are various employees of the Colorado School of Mines ("CSM"). Plaintiffs' son, Demetrios "Rio" Nicholas, was a freshman at CSM when he was discovered dead in the shower of his dorm suite. CSM concluded Rio's death was a self-induced drug overdose, but Plaintiffs suspect he was the victim of a wrongful death. They alleged Defendants intentionally covered up evidence suggesting Rio was the victim of a homicide. Plaintiffs further alleged crucial evidence was destroyed or tampered with by Defendants and it is now impossible for them to bring a viable wrongful death claim against the individual(s) responsible for Rio's death. Defendants moved for summary judgment based upon, *inter alia*, the statute of limitations, and the district court granted the motion. Assuming, without deciding, that Plaintiffs state a viable cause of action, we hold the action is barred by Colorado's two year statute of limitations because the action was commenced more than two years after Plaintiffs had knowledge of nearly all the facts relied upon in their amended complaint. We therefore **AFFIRM** the decision of the district court.

## II. Background

Rio Nicholas was a freshman at CSM in the fall of 2001. In the early morning hours of December 6, 2001, Rio was found dead in the shower of his dorm suite. Rio had a needle mark on his arm and a capped, used syringe was on the shower floor. The CSM police report stated Rio was already dead when the police arrived. The campus police closed their investigation the following day

after the investigator from the county coroner's office concluded the death was a cocaine overdose.

Plaintiffs suspected the death was not accidental. When Rio's body was discovered, there were bloody abrasions on his knuckles and the toes of one foot. His forehead was discolored. The mortician preparing the body for burial also noted bruising on his chin and indelible grid-shaped marks on the left side of his face. Plaintiffs were wary of Rio's roommate, Brandon Reese, who had first discovered Rio's body and who was arrested by CSM police in early 2002 for possession of drugs. When Rio was home for Thanksgiving, he had described Reese and Reese's friends as "dirty."

At the suggestion of Rio's ROTC officer, who thought the death was suspicious, Plaintiff John Nicholas read the CSM police report in January 2002. The report raised further concerns in his mind. The report described two additional used syringes in the dorm room's trash can, suggesting to John that multiple people were using drugs because Rio had but one puncture mark on his arm. Rio's jeans were on the floor of the bathroom and the pockets contained only cocaine and syringe packaging, raising questions in John's mind about whether the jeans had been planted. The police found ninety-two syringes in Rio's backpack, which John also found suspicious.

In January and February of 2002, Plaintiffs contacted and met with various CSM officials to express their concerns about CSM's official explanation of Rio's

death. They also contacted Rio's instructors, his friends on campus, and the coroner's office. In February 2002, CSM promised it would retain a private investigator to investigate the matter. Plaintiffs soon learned, however, that CSM did not in fact hire a private investigator but instead instructed the campus police to conduct another investigation. Still unsatisfied with CSM's handling of the matter, Plaintiffs contacted an attorney in the summer of 2002 to help find out what had happened to Rio. The attorney, Michael Hinton, hired two investigators and put Plaintiffs in touch with a third investigator. John Nicholas testified that CSM imposed various roadblocks to hinder Edmond Martin, one of the investigators.

The investigators hired by Plaintiffs in 2002 interviewed witnesses, communicated with county officials, and reviewed official documents. In March of 2003, Edmond Martin's firm, Sage Investigations, released to Hinton a Final Report ("Sage Report") on Rio's death. John Nicholas testified he reviewed the report after it was completed.

The Sage Report contained, among other things, a detailed examination of the facts and circumstances surrounding Rio's death and concluded "questions still exist about the death of Rio Nicholas." The Report listed numerous "inconsistencies" with CSM's official explanation. The Report also identified numerous problems with how the campus police handled the matter. These problems included the failure to secure the dorm suite where the body was found

and preserve it as a crime scene, the failure to adequately examine Rio's body for evidence, the failure to preserve the syringes found in Rio's apartment or examine them for fingerprints and blood residue, and the failure to adequately interview material witnesses.

The Sage Report stopped short of alleging the campus police intentionally mishandled the investigation. It did allege the police "prejudged" the situation. It also alleged one police officer, Sargeant Allen, was prejudiced against Rio because Allen had been in the Air Force and he thought Rio was a poor candidate for Air Force ROTC in light of his tattoos and piercings. The report also questioned whether the campus police were biased in favor of Brandon Reese because he had worked for the department as a dispatcher. Finally, the Sage Report alleged the supplemental police investigation conducted at the Nicholas's urging was primarily concerned with identifying the source of the drugs for the benefit of the local drug task force.

Martin sent a version of the Sage Report to the Jefferson County District Attorney's Office. The district attorney's office had conducted an investigation in the spring of 2002 that accepted the findings of the campus police. On May 6 and May 7, 2003, Brenda and John Nicholas wrote separate letters to the District Attorney requesting a new investigation. The letters indicated Plaintiffs' belief that Rio's death was not a self-induced, unattended drug overdose. The letters

also indicated Plaintiffs believed they had been intentionally misled by the CSM police.

Following Plaintiffs' renewed pleas for help, the district attorney's office looked into the case again. Plaintiffs were ultimately dissatisfied with this investigation because the district attorney's office declined to perform various forensic tests requested by Plaintiffs. Plaintiffs provided the Sage Report to a medical expert, Dr. Joseph Batuello, who, in April of 2005, sent a letter to one of Plaintiffs' attorneys with various "observations" regarding Rio's death. Dr. Batuello believed the amount of cocaine found in Rio's body was consistent with a cocaine overdose, but found it "highly unlikely" that Rio used more than one syringe. Dr. Batuello also stated that without a carefully conducted autopsy it was impossible to rule out trauma, asphyxiation, or poisoning as possible causes of death. Finally, Dr. Batuello observed that the blood on the wall of the shower likely did not come from the abrasions on Rio's hands and feet, because the blood vessels in extremities are too small to deposit blood on a surface not in contact with the wound. In June of 2005, Dr. Linda Norton, a former medical examiner, reviewed the Sage Report and drafted a one-page opinion concluding Rio was in a group setting when he was injected with a lethal dose of cocaine, his body was subsequently moved into a shower stall, and evidence was planted in an attempt to cover up what had occurred.

Plaintiffs also obtained samples of Rio's blood and urine from the coroner's office. They submitted the samples to a laboratory for testing and in August of 2005 Plaintiffs learned the lab results. The lab results indicated Rio had far less cocaine and cocaine metabolites in his blood than had originally been reported. A consultant, Earnest Street, opined that based upon these lab results, Rio did not die of a cocaine overdose.

On October 19, 2005, John and Brenda Nicholas filed suit against Richard M. Boyd, the Chief of Police and Director of Public Safety for CSM; Robert Allen, a sergeant in the CSM police department; Harold Cheuvront, a dean at CSM; and Bob Francisco, another CSM employee. The complaint set forth claims of denial of access to the courts and conspiracy to deny access to the courts.[1] The claims were brought under 42 U.S.C. § 1983. The plaintiffs identified the right of access to the courts as a right guaranteed by Article IV of the Constitution, the First and Fourteenth Amendments, and the Civil Rights Act of 1971.

The amended complaint alleged a number of facts suggesting Rio's death was not an accidental, self-induced drug overdose. These facts are: Rio's body was found in an upright seated position with his legs crossed; he had discoloration in his face and forehead and a grid-shaped imprint on his face, suggesting he died with his head on the floor; blood was smeared on the shower wall, suggesting an open wound on Rio's head or torso; Rio made statements when he was home

---

[1]Plaintiffs have abandoned their conspiracy claim on appeal.

during Thanksgiving that Reese and Reese's friends were "dirty people" and that Rio was being stalked by a CSM student; there were abrasions on Rio's body and bruises on his hands and feet which suggested his body was moved after he was incapacitated; the syringe in the shower was capped, and Rio was unlikely to have capped the syringe after injecting a lethal amount of cocaine; when another roommate came upon Rio's dead body, Reese was already present and holding the capped syringe in his hand; Rio had only one puncture wound, but there were three used syringes found in the dorm room; the only items in the pockets of the jeans found in the bathroom were drug paraphernalia; Rio's bed was made and covered with school items, suggesting Rio had not slept in it the night of his death; Reese changed his story of why Rio took a shower; Philip Javernick, another CSM student who had Rio's name tattooed on his body,[2] purchased cocaine the day before Rio's death and left CSM shortly after Rio's death without returning; Javernick and Reese gave an alibi regarding their whereabouts the night Rio died that was contradicted by eyewitnesses; and Rio's backpack was open when his body was discovered, but when police retrieved the backpack the next day it was padlocked shut and contained ninety-two syringes.

---

[2]Some students told investigators Javernick got the tattoo after Rio died, but another witness said when Rio was home for Thanksgiving he had mentioned a "stalker" with Rio's name tattooed on his body.

After discovery, Defendants moved for summary judgment on two grounds: the statute of limitations and qualified immunity. The district court granted summary judgment based upon the statute of limitations.

## III. Discussion

This court reviews a grant of summary judgment de novo, "applying the same standards as the district court." *ACLU v. Santillanes*, 546 F.3d 1313, 1317 (10th Cir. 2008). Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Facts are viewed in the light most favorable to the nonmoving party. *Santillanes*, 546 F.3d at 1317.

Plaintiffs seek relief pursuant to 42 U.S.C. § 1983. The applicable statute of limitations in § 1983 actions is generally the residual statute of limitations for personal injury actions in the forum state. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). In Colorado, the applicable statute of limitations is two years. Colo. Rev. Stat. § 13-80-102(1)(i); *Blake v. Dickason*, 997 F.2d 749, 750-51 (10th Cir. 1993).

Although Colorado law supplies the applicable statute of limitations, federal law governs the accrual of a federal cause of action. *Smith v. City of Enid*, 149 F.3d 1151, 1154 (10th Cir. 1998). "A civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id.* (quotation omitted). Claims under § 1983 assert a violation of a

federal right, and therefore such claims accrue when the plaintiffs know or should know their rights have been violated. *Id.* A plaintiff "need not have conclusive evidence of the cause of an injury in order to trigger the statute of limitations." *Alexander v. Okla.*, 382 F.3d 1206, 1216 (10th Cir. 2004). Nor must a plaintiff "know all of the evidence ultimately relied on for the cause of action to accrue." *Baker v. Bd. of Regents*, 991 F.2d 628, 632 (10th Cir. 1993). "A civil rights action accrues when facts that would support a cause of action are or should be apparent." *Fratus v. DeLand*, 49 F.3d 673, 675 (10th Cir. 1995) (quotation omitted). The test is an objective one, with the focus "on whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm." *Alexander*, 382 F.3d at 1216.

For the purpose of evaluating the statute of limitations defense, this court assumes, without deciding, the amended complaint makes out a viable claim for denial of access to the courts.[3] A claim for denial of access to the courts is

---

[3]Defendants assert the Tenth Circuit has never recognized the type of denial of access to the courts claim being asserted by Plaintiffs, and they are therefore entitled to qualified immunity. *See Jennings v. City of Stillwater*, 383 F.3d 1199, 1207 (10th Cir. 2004) (stating the Tenth Circuit has not recognized a claim of denial of access to the courts for a police cover-up); *Wilson v. Meeks*, 52 F.3d 1547, 1557 (10th Cir. 1995) (stating Tenth Circuit precedent did not clearly establish a duty to avoid a police cover-up, but not resolving the question). *But see Donohue v. Hoey*, 109 F. App'x 340, 356-57 (10th Cir. 2004) (stating intentional destruction of evidence can constitute a violation of the right of access to the courts); *Stump v. Gates*, No. 92-1134, 1993 WL 33875, at *2-3 (10th Cir. Feb. 11, 1993) (holding police department employees are not entitled to qualified immunity to claim that "deliberate failure to investigate and quick destruction of
(continued...)

ancillary to some underlying state or federal action. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Plaintiffs claim Rio was the victim of a wrongful death. For Plaintiffs to bring a wrongful death action under Colorado law, they must prove Rio was fatally injured by "a wrongful act, neglect, or default of another." Colo. Rev. Stat. Ann. § 13-21-202. Plaintiffs assert it is now impossible to prove Rio died due to the wrongful acts of another person because the Defendants' intentional acts deprived them of the necessary evidence to do so. Therefore, the claim for denial of access to the courts accrued when Plaintiffs knew, or should have known, the acts of Defendants deprived them of evidence necessary to bring a wrongful death action.

The district court concluded that, at the latest, the statute of limitations began to run on May 7, 2003, when John Nicholas mailed a letter to the Jefferson County District Attorney's Office with allegations of foul play and police misconduct in connection with Rio's death. Because the test for accrual of the statute of limitations is objective, *see Alexander*, 382 F.3d at 1216, the contents of John and Brenda's letters to the District Attorney are only relevant insofar as they reveal what facts were known, not for the beliefs or suspicions they contain. The letters sent in May 2003 do mention some of the facts relied upon in the

---

[3](...continued)
evidence that might have proved homicide was a violation of [plaintiffs'] right of access to the courts"). This court need not rule on the question because, even if Plaintiffs have a cognizable claim, it is barred by the applicable statute of limitations.

amended complaint. More relevant to the question of the extent of Plaintiffs' knowledge, however, is the Sage Report, which John Nicholas testified he reviewed in the spring of 2003. The Sage Report contains nearly all of the facts contained in the amended complaint. It contains synopses of Rio's conversations with family and friends in Texas over Thanksgiving; the changes in Reese's story; Javernick's purchase of cocaine; the eyewitness testimony refuting Reese's and Javernick's alibi; details regarding the position and appearance of Rio's body; and discussions about the evidence in the dorm room, including the extra syringes, the jeans, and the backpack.

Only one fact relied upon in the amended complaint is absent from the Sage Report: the fact that the syringe in the shower was capped. This fact was in a police report filed by the Golden Police Department, which was obtained by Plaintiffs' investigator. The record does not indicate whether this police report was appended in its entirety to the Sage Report, and therefore it is unclear when Plaintiffs learned of this fact. Even if Plaintiffs learned of the cap on the syringe at some later date, however, the Sage Report still contained nearly all of the facts underpinning the Plaintiffs' theory, set out in the amended complaint, that Rio's death was wrongful. The statute of limitations may begin to accrue before a party has all the evidence supporting its case. *Baker*, 991 F.2d at 632. It begins to run when the plaintiff knows facts sufficient to support a cause of action. *Fratus*, 49 F.3d at 675. Based upon the facts in the Sage Report, Plaintiffs could have

drafted a complaint in the spring of 2003 nearly identical to the amended complaint filed over two years later.

The only information identified by Plaintiffs which they received after the spring of 2003 is from Dr. Batuello's letter, Dr. Norton's draft opinion, and the toxicology lab results. Plaintiffs claim they only had a sufficient factual basis to proceed on their denial of access to the courts claim once they received these communications. In particular, they assert they did not earlier know Rio's death was wrongful. Plaintiffs do not assert they learned of any new police misconduct after the spring of 2003.

As an initial matter, two of the three communications Plaintiffs received after the spring of 2003 were the opinions of experts based entirely upon facts contained in the Sage Report and known to Plaintiffs in the spring of 2003. The only genuinely new information Plaintiffs learned after the spring of 2003 was the lab results reported in August 2005. The lab results, if believed, strengthened the hypothesis that the cause of death was not a cocaine overdose. They were not, however, the crux of Plaintiffs' case that Rio's death may have been wrongful. In fact, the lab results are not even mentioned in the amended complaint, which lists a drug overdose as a possible cause of death.[4] In the amended complaint, Plaintiffs alleged the position and appearance of Rio's body, as well as the suspicious placement of drug paraphernalia in the dorm suite, gave Defendants

_____

[4]The lab results were referenced in the original complaint.

reasonable cause to believe "that probable cause existed to commence a homicide investigation." The lab results may have strengthened the claim that the official explanation of Rio's death was incomplete, but the statute of limitations may begin to run before all the evidence in a case is collected. *Baker*, 991 F.2d at 632 (holding the statute of limitations begins to run when a plaintiff knows or should know of the injury). The amended complaint is based almost entirely upon facts present in the Sage Report and therefore known to Plaintiffs no later than the spring of 2003. Based on the facts known to Plaintiffs in the spring of 2003, they knew or should have known of the injury they alleged in their complaint.[5]

Plaintiffs also argue the statute of limitations question involves disputed issues of fact and was thus inappropriately resolved at the summary judgment stage. They cite to numerous cases from federal and state court for the proposition that the reasonable diligence of a plaintiff in discovering information giving rise to a cause of action is a question of fact. This case, however, is not about reasonable diligence. Regardless of whether it was reasonable to conduct their own investigation, Plaintiffs did so, and thereby gained actual knowledge of

---

[5]Plaintiffs rely heavily upon *Stump v. Gates*, 777 F. Supp. 808 (D. Colo. 1991), *aff'd*, 986 F.2d 1429 (10th Cir. 1993) in arguing the statute of limitations has not expired. *Stump* is distinguishable. In that case, the plaintiffs never performed their own investigation into the death of their father, and the district court concluded they were under no duty to do so to avoid the expiration of the statute of limitations. *Id.* at 822. Here, whether they had a duty to do so or not, Plaintiffs did in fact undertake their own investigation into the death of their son. Because they had knowledge of the injury they allege in the spring of 2003, the statute of limitations began to accrue no later than that time.

the facts underlying their claim. It was therefore proper for the district court to resolve the statute of limitations question at the summary judgment stage.

Finally, Plaintiffs argue the statute of limitations question is inextricably tied to the ultimate factual question of whether Rio's death was wrongful. Because the wrongfulness of Rio's death is a question of fact, Plaintiffs argue, so too is the question of when they knew the death was wrongful. This argument, however, is premised on a fundamental misunderstanding of the statute of limitations inquiry. In determining whether the statute of limitations has expired, a court considers when the plaintiff knew or should have known the facts supporting the claim. *Fratus*, 49 F.3d at 675. Here, the complaint is almost entirely supported by facts known to the plaintiffs more than two years before they filed suit. It requires no resolution of the ultimate merits of the case to conclude that a suit based upon facts known for more than two years is barred by a two-year statute of limitations.

## IV. Conclusion

Because the factual allegations in the amended complaint were nearly all known to Plaintiffs over two years prior to the filing of their suit, the suit is

barred by the two-year statute of limitations.  The judgment of the district court is

hereby **AFFIRMED.**

ENTERED FOR THE COURT


Michael R. Murphy
Circuit Judge

07-1444, <u>Nicholas v. Boyd</u>

**LUCERO**, **J.**, concurring in the judgment.

I respectfully disagree with my colleagues' analysis of the statute of limitations issue, which, in my view, falters for two reasons. First, the majority inquires solely into the plaintiffs' knowledge of official misconduct while failing to examine whether the plaintiffs knew they had an arguable wrongful death claim, an element of an access to courts cause of action. Second, the majority analyzes the plaintiffs' subjective knowledge of the facts alleged in their complaint without asking whether, in addition, those facts should have put them on notice of their right to sue. Yet because I conclude that qualified immunity is available to the defendants, I would affirm on these alternative grounds.

The majority first concludes that "the claim for denial of access to the courts accrued when Plaintiffs knew, or should have known, the <u>acts of Defendants deprived them of evidence necessary</u> to bring a wrongful death action." Majority Op. at 11 (emphasis added). In light of the Supreme Court's holding in <u>Christopher v. Harbury</u>, 536 U.S. 403, 415 (2002), however, this cannot be the entire inquiry. In <u>Christopher</u>, the Court assumed that the right of access to courts can be violated due to official interference with the opportunity to seek relief and held that the existence of such an opportunity "is an element that must be described in the complaint."[1] <u>Id.</u> Specifically, the "plaintiff must

_____

[1] I agree with my colleagues that it is unclear in our circuit whether such a
(continued...)

identify a nonfrivolous, arguable underlying claim." Id. (quotation omitted). If the existence of an underlying wrongful death claim is an element of the constitutional violation, surely a plaintiff's access to courts claim cannot accrue until she knows, or should know, of the arguable underlying claim.[2] Thus, the majority's exclusive focus on the plaintiffs' knowledge of official misconduct misses the mark.

As for my second point of disagreement, the majority reasons that "[b]ecause the factual allegations in the amended complaint were nearly all known to Plaintiffs over two years prior to the filing of their suit, the suit is barred by the two-year statute of limitations." Majority Op. at 15-16. This statement erroneously focuses on the plaintiffs' knowledge of those facts pleaded in the complaint. Yet plaintiffs' knowledge of the facts in the complaint is dispositive only if those facts were sufficient to put a reasonable person on notice of the injury that underlies the cause of action. See Alexander v. Oklahoma, 382 F.3d 1206, 1216 (10th Cir. 2004) (using an objective test to determine when a

---

[1](...continued)
constitutional claim exists. See Majority Op. at 10-11 n.3.

[2] It is very much an open question what a plaintiff must allege to "identify a nonfrivolous, arguable" wrongful death claim. See Christopher, 536 U.S. at 415. Because the very misconduct that plaintiffs seek to challenge will often prevent them from knowing enough to actually file a wrongful death claim, presumably they need not "identify" the underlying wrongful death claim with the same specificity we would require for such a claim to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Because I would resolve this case on qualified immunity grounds, I leave this question for another day.

federal cause of action accrues). By narrowly focusing on plaintiffs' knowledge of the facts alleged in the amended complaint without inquiring whether those facts would have put a reasonable person on notice of a constitutional violation, the majority risks transforming an objective inquiry into a subjective one.

As noted, I would affirm the grant of summary judgment, but on alternative grounds. Our law is anything but clearly established regarding the existence and contours of a § 1983 access to courts claim based upon official destruction of evidence or investigatory failures. See Majority Op. at 10-11 n.3. Pearson v. Callahan, recently decided by the Supreme Court, allows a court to grant qualified immunity without deciding whether a violation occurred when the right claimed to have been violated was not clearly established. 129 S. Ct. 808, 818 (2009) (reasoning that in cases where it is "far from obvious" that a right exists, it may be appropriate not to decide whether there has been a violation). This fact-intensive case, premised on a constitutional claim of unclear viability, would best be handled in that fashion.

For the foregoing reasons, I concur in the judgment of my respected colleagues.