CALABRESI, Circuit Judge,
joined by Judges POOLER, SACK, and PARKER, dissenting.
I respectfully dissent. I join Judge Sack’s, Judge Parker’s, and Judge Pooler’s dissenting opinions in full. But, because I believe that when the history of this distinguished court is written, today’s majority decision will be viewed with dismay, I add a few words of my own, “... more in sorrow than in anger.” Hamlet, act 1, sc. 2.
My colleagues have already provided ample reason to regret the path the majority has chosen. In its utter subservience to the executive branch, its distortion of Bivens doctrine, its unrealistic pleading standards, its misunderstanding of the TVPA and of § 1983, as well as in its persistent choice of broad dicta where narrow analysis would have sufficed, the majority opinion goes seriously astray. It does so, moreover, with the result that a person — whom we must assume (a) was totally innocent and (b) was made to suffer excruciatingly (c) through the misguided deeds of individuals acting under color of federal law — is effectively left without a U.S. remedy. See especially dissenting opinion of Judge Parker.
All this, as the other dissenters have powerfully demonstrated, is surely bad enough. I write to discuss one last failing, an unsoundness that, although it may not be the most significant to Maher Arar himself, is of signal importance to us as federal judges: the majority’s unwavering willfulness. It has engaged in what properly can be described as extraordinary judicial activism.[1] It has violated longstanding canons of restraint that properly must guide courts when they face complex and searing questions that involve potentially fundamental constitutional rights. It has reached out to decide an issue that should not have been resolved at this stage of Arar’s ease. Moreover, in doing this, the court has justified its holding with side comments (as to other fields of law such as torts) that are both sweeping and wrong. That the majority — made up of colleagues I greatly respect — has done all this with the best of intentions, and in the belief that its holding is necessary in a time of crisis, I do not doubt. But this does not alter my conviction that in calmer times, wise people will ask themselves: how could such able and worthy judges have done that?
I
I focus first on the willful reaching out to decide a hard constitutional question. “If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.” Spector Motor Serv., Inc. v. *631 McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944). The Supreme Court long ago made clear that it would not — and that we should not — '“pass upon a constitutional question although properly-presented by the record, if there is also present some other ground upon which the case may be disposed of.” Ashwander v. TVA 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); see also, e.g., Alexander v. Louisiana, 405 U.S. 625, 633, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) (“[W]e follow our usual custom of avoiding decision of constitutional issues unnecessary to the decision of the case before us.”); Burton v. United States, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905) (“It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.”). We ourselves have described this canon of constitutional avoidance as “axiomatic,” Allstate Ins. Co. v. Serio, 261 F.3d 143, 149 (2d Cir.2001), and have long allowed it to “dictatef]” our decisions in appropriate circumstances. Fine v. City of New York, 529 F.2d 70, 76 (2d Cir.1975).[2]
The question that today’s majority elects to decide implicates this fundamental principle. This is because the existence vel non of a claim meriting a Bivens remedy, in the absence of any congressionally mandated relief, is a matter of constitutional interpretation. As early as Bivens itself, the Supreme Court made clear that the cause of action it recognized arose “under” the Constitution. Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). As Justice Harlan said in his influential concurrence in Bivens, “the source of the legal interest” protected by any Bivens action is “the Federal Constitution itself’; “the Constitution is in the relevant sense a source of legal protection for the ‘rights’ enumerated therein.” Id. at 402 n. 3, 91 S.Ct. 1999 (Harlan, J., concurring). And even the majority here describes Bivens as “a judicially-created remedy stemming directly from the Constitution itself.” Maj. Op. at 571 (emphasis added).[3]
I recognize that this question — the constitutional status of Bivens actions — is one *632 that has vexed some in academia. But as is often the case, what can be layered with mystery in the pages of a law review is, in practice, fairly simple. When a court concludes that a Bivens action is appropriate, it is holding that, on the then-present state of the law, the Constitution requires the court to create a remedy. As even the staunchest critics of Bivens recognize, a holding that a particular constitutional right implies a remedy “can presumably not even be repudiated by Congress.” Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 75, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (Scalia, J., concurring). While Congress can vitiate the need for a judicially created Bivens remedy by providing an “alternative ... process for protecting the [constitutional] interest,” Wilkie v. Robbins, 551 U.S. 537, 550, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007),[4] it cannot overturn a holding that some remedy is necessary.[5] This is the essence of a constitutional holding, and hence one directly subject to the avoidance canon.[6]
That avoiding difficult constitutional questions like those before us is the proper *633 course was made clear by the Supreme Court in Christopher v. Harbury, 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002). In that case, the only issue before the Supreme Court was whether Harbur/s Bivens action for denial of access to courts could proceed. Id. at 412, 91 S.Ct. 1999. Justice Souter (for eight members of the Court) wrote that whether this Bivens action lies would require an inquiry that raises
concerns for the separation of powers in trenching on matters committed to the other branches. Since the need to resolve such constitutional issues ought to be avoided where possible, the [courts] should ... as soon as possible in the litigation [determine] whether a potential constitutional ruling may be obviated because the allegations of denied access fail to state a claim on which relief could be granted.
Id. at 417, 91 S.Ct. 1999 (emphasis added). The Court, in other words, said we must first decide if there are non-Bivens grounds for resolving the dispute, and only then address the constitutional issues raised by Bivens actions.[7] This practice, the Court stated, comports with “the obligation of the Judicial Branch to avoid deciding constitutional issues needlessly.”
Id. The Court then proceeded to examine closely the cause of action that Harbury claimed to have lost through the defendants’ behavior, determined that it was insufficient to justify relief, and, on that non-constitutional basis, dismissed Harbury’s claim. Id. at 418, 91 S.Ct. 1999.
The implications for Arar’s case could hardly be more manifest. The national security concerns that the majority relies upon in its special factors analysis are precisely those that the Supreme Court said must be avoided in Harbury. And in such circumstances, it is our job to put “the trial court ... in a position as soon as possible in the litigation to know whether a potential constitutional ruling may be obviated.” Id. at 417, 122 S.Ct. 2179. For reasons that will be clear soon enough, it may well be that, on remand, this case would, for non-constitutional reasons, “fail to state a claim on which relief could be granted.” Id. at 417,122 S.Ct. 2179. That being so, the Supreme Court has told us, we must avoid constitutional pronouncements.
For this Court to go out of its way to decide on Bivens grounds when it is not necessary is, therefore, a reaching out of a particularly dangerous sort, regardless of what conclusion the Court comes to on the *634 Bivens question.[8] If — as I would if I had to face the question — -we were to decide that Bivens applies, then some remedy would be necessary regardless of Congress’s preference. If, as the majority chooses to do, we rule that Bivens does not apply, we have said that, in a wide variety of cases, the Constitution fails to give protection. Both positions require a parsing of the Great Charter. When such a decision cannot be avoided, so be it: we do our job. But where it can be avoided, it should be.
II
So, how might the Bivens issue have been avoided? As Judge Sack explains in his eloquent dissent, this might be done through first examining the significance of the state secrets privilege to this case.[9] That privilege has long required dismissal in those rare cases where national security interests so drastically limit the evidence that can be introduced as to deprive either a plaintiff or a defendant of an opportunity to make its case. See, e.g., Zuckerbraun v. Gen. Dynamics Corp., 935 F.2d 544, 547 (2d Cir.1991); see also United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953); El-Masri v. United States, 479 F.3d 296, 308 (4th Cir.2007) (“[A] proceeding in which the state secrets privilege is successfully interposed must be dismissed if the circumstances make clear that privileged information will be so central to the litigation that any attempt to proceed will threaten that information’s disclosure.”). In a case such as this, where the Government asserts that the plaintiffs claim implicates vital national secrets, we must, before we move to the merits, examine the consequences of our duty to guard against any potentially harmful disclosures.
The majority obviously shares our concerns about the protection of state secrets, as virtually every “special factor” identified in the majority opinion concerns clas *635 sified material. But, as Judge Sack says, this amounts to double-counting of the Government’s interest in preserving state secrets. See dissenting opinion of Judge Sack at 601. We already possess a well-established method for protecting secrets, one that is more than adequate to meet the majority’s concern.[10] Denying a Bivens remedy because state secrets might be revealed is a bit like denying a criminal trial for fear that a juror might be intimidated: it allows a risk, that the law is already at great pains to eliminate, to negate entirely substantial rights and procedures.
Even more mystifying is the majority’s insistence that it is respecting “[t]he preference for open rather than clandestine court proceedings.” Maj. Op. at 577. How, exactly, does the majority promote openness by shaping a constitutional decision around the fact that state secrets might be involved in a claim? The state secrets doctrine is undoubtedly in tension with the public right of access to the courts, but the majority’s approach is more opaque than any state secrets resolution. When a court properly applies the state secrets doctrine, the case at bar will proceed only if the alleged state secrets are not vital to a claim or defense, so there should be little fear that a substantive holding will ultimately turn on secret material. By contrast, consider the harm done to the openness of the court system by what the majority does here. It bars any action in the face of what we are required to assume are outrageous constitutional violations, and it does so simply because state secrets might possibly be involved, without having a court look into that very question. As a result, even if the Government’s claimed need for secrecy turned out to be wholly illusory, there would be no recourse! Indeed, even if the Government declassified every document relating to this case, even if all four countries involved announced that they had nothing to hide and that Arar’s claim should proceed so that they could be exonerated, there would be no open judicial testing of Arar’s allegations. Which approach should give us more cause to hesitate?
The majority further errs in its use and abuse of other fields of law. In trying to find “special factors” that could justify barring a Bivens claim (but do not depend on “state secrets”) the majority points to two issues that arise in every tort suit against a government official. If they are valid here they would appear to counsel “hesitation” in (and, under the majority’s reasoning, seemingly preclude) every Bivens action. First, the majority warns that “[t]he risk of graymail ... counsels hesitation in creating a Bivens remedy.” Maj. Op. at 579. Because the risk of unwarranted and dangerous disclosure is so high, the Government will be pressured into settling merit-less cases. Second, as a consequence of such graymail, the Government, rather than individual defendants, would wind up paying off claims. See Maj. Op. at 580. Because these possibilities are “an endemic risk in cases (however few) which involve a claim like Arar’s,” the majority concludes, they make Bivens actions particularly inappropriate. Maj. Op. at 579.
But both of these issues — the risk of graymail and the disjunction between individual defendants and an indemnifying government — are present in every tort suit against a government agent, not just the *636 relatively “few” cases involving extraordinary rendition for the purposes of torture.[11] Taking the latter point first, both state and federal officers are almost universally indemnified by the State if they lose tort suits. In Bivens cases, the federal government “indemnifies its employees against constitutional tort judgments or settlements (in the rare instances in which a Bivens claim results in a monetary liability) and takes responsibility for litigating such suits.” Cornelia T.L. Pillard, Taking Fiction Seriously: The Strange Results of Public Officials’ Individual Liability Under Bivens, 88 Geo. L.J. 65, 76 (1999). Indeed, “[a]s a practical matter ... indemnification is a virtual certainty.” Id. at 77. Similarly, as is widely understood, “a suit against a state officer is functionally a suit against the state, for the state defends the action and pays any adverse judgment. So far as can be assessed, this is true not occasionally and haphazardly but pervasively and dependably.” John C. Jeffries, Jr., In Praise of the Eleventh Amendment and Section 1983, 84 Va. L.Rev. 47, 50 (1998) (citation omitted). So the majority’s point proves far too much: if a Bivens action is inappropriate where the individual defendants’ pocketbooks are not ultimately at risk, then Bivens actions are always inappropriate. And while the majority could be right that, as a policy matter, tort suits against financially indifferent defendants are unwise, who are we as federal appellate judges to say that what is standard tort law in every state in the nation, and what has been repeatedly approved by the Supreme Court and every federal circuit, is fatally unacceptable?
As to graymail, defendants in civil suits are always subject to pressures to settle, yet this has never been considered a reason to bar categorically a type of suit against government officials. Is the desire to avoid the revelation of state secrets (a desire that is already fully accommodated by the state secrets doctrine) so different from the desire to avoid, for example, devastating reputational injury, which will often drive a state or federal entity’s response to a suit? How is the hassle attendant on a claim like Arar’s — the “enmeshing of] government lawyers” and the “eliciting of] government funds for settlement,” Maj. Op. at 574 — so much worse here than it is in the types of suits that every state has chosen to permit and that all three branches of the federal Government have accepted since Bivens was issued almost 40 years ago? [12]
*637 These, then, are the majority’s determinative “special factors”: a mix of risks that are amply addressed by the state secrets doctrine and policy concerns that inhere in all Bivens actions and in innumerable every-day tort actions as well.[13] This maladaptation of a Bivens analysis, as far as I can tell, is motivated by a belief that the majority’s holding is necessary to protect our nation’s security. But, as I have already said, that worthy concern both can be and should be protected by already existing ordinary law and not by reaching out and potentially warping the Constitution.
Ill
The state secrets doctrine has recently come in for significant criticism, much of it warranted. In particular, many commentators — not to mention the Obama administration and a Ninth Circuit panel — have suggested that outright dismissal of a case on state secrets grounds should be disfavored. See, e.g., Mohamed v. Jeppesen Dataplan, Inc., 563 F.3d 992, 1006 (9th Cir.2009), amended at 579 F.3d 943, reh’g en banc granted by No. 08-15693, 2009 WL 3526219, 586 F.3d 1108, 2009 U.S.App. LEXIS 23595; Policies and Procedures Governing Invocation of the State Secrets Privilege, Memorandum from the Attorney Gen. to Heads of Exec. Dep’ts and Agencies (Sept. 23, 2009), available at http:// www.usdoj .gov/opa/documents/statesecret-priviliges.pdf. There is much to these concerns. But I would note three reasons that a threshold dismissal for want of evidence due to the existence of state secrets (if that were eventually determined necessary) would be preferable to the constitutional holding made today. And this would be so, I suggest, quite apart from the importance of adhering to the canon of constitutional avoidance.
First, a dismissal because a party simply cannot (for reasons of state secrets) proffer necessary evidence says nothing about the merits of the underlying claim.[14] While this may be deeply unfair to a party who has been grievously injured (as we must assume Arar was), it, at least, does no damage to the legal standards by which other parties’ claims are judged.
Second, a routine practice of first considering state secrets avoids the risk of a certain type of Government gamesmanship. If the Government has the option of seeking a state secrets dismissal both before and after a decision on some open question, then it has the ability to moot unfavorable rulings. Consider the strate *638 gy in this case. The Government’s initial filing before the District Court sought a state secrets dismissal. In its brief for this en banc hearing, however, after it had won a favorable substantive ruling from the District Court and the panel, the Government did not mention any interest in a remand for a state secrets dismissal.[15] It seems more than likely that, had the District Court or the panel found against the Government on the Bivens question, the Government would be arguing to us that the opinion below should be vacated pending a state secrets determination. To be sure, a party has no obligation to fire all of its guns at once when a single argument can shoot a claim down. And I do not mean to imply any devious motive on the part of the Government in this case in particular. But there is no reason to structure our law to facilitate such conduct.
Third, and most important, a holding that Arar, even if all of his allegations are true, has suffered no remediable constitutional harm legitimates the Government’s actions in a way that a state secrets dismissal would not. The conduct that Arar alleges is repugnant, but the majority signals — whether it intends to or not — that it is not constitutionally repugnant. Indeed, the majority expressly states that the legal significance of the conduct Arar alleges is a matter that should be left entirely to congressional whim. See Maj. Op. at 582. While a state secrets dismissal would similarly move the locus of redress to the political branches, it would do so not by holding that the harm done to Arar is of no concern to the judiciary or to -the Constitution. It would do so, instead, by acknowledging an institutional limitation— due to the presence of state secrets — that is independent of the merits of Arar’s claim and would, thereby, invite other branches to look into those possible merits.
This leads to my final point. Whether extraordinary rendition is constitutionally permissible is a question that seems to divide our country. It seems to me obvious, however, that regardless of the propriety of such renditions, an issue on which I won’t hide my strong feelings, mistakes will be made in its operation. And more obvious still is that a civilized polity, when it errs, admits it and seeks to give redress. In some countries, this occurs through a royal commission. In the United States, for better or worse, courts are, almost universally, involved. This being so, and regardless of whether the Constitution itself requires that there be such redress, the object must be to create and use judicial structures that facilitate the giving of compensation, at least to innocent victims, while protecting from disclosure those facts that cannot be revealed without endangering national security. That might well occur here through the application of a sophisticated state secrets doctrine.[16] It *639 does not occur when, at the outset, Arar’s claims — though assumed true and constitutionally significant — are treated as lacking any remedy. And this is just what today’s unfortunate holding does. It hampers an admission of error, if error occurred; it decides constitutional questions that should be avoided; it is, I submit, on all counts, utterly wrong. I therefore must regretfully, but emphatically, dissent.

. I use this much abused phrase "judicial activism,” in its literal sense, to mean the unnecessary reaching out to decide issues that need not be resolved, the violation of what Chief Justice Roberts called "the cardinal principle of judicial restraint — if it is not necessary to decide more, it is necessary not to decide more.” PDK Labs., Inc. v. U.S. DEA, 362 F.3d 786, 799 (D.C.Cir.2004) (Roberts, J., concurring).

. There is also a canon that courts should not lightly find legislation to be unconstitutional. See, e.g., Clark v. Suarez Martinez, 543 U.S. 371, 381-82, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). That canon is of great importance, and is related to but separate from the canon to which I am referring. See id. at 381, 125 S.Ct. 716. It derives from the so-called "majoritarian difficulty,” the fact that courts are, generally, not representative bodies. See Alexander M. Bickel, The Least Dangerous Branch 16-17 (2d ed. 1986) ("[W]hen the Supreme Court declares unconstitutional a legislative act or the action of an elected executive, it thwarts the will of representatives of the actual people....”) The canon at issue in this case is different, however, and demands, more broadly, that unnecessary constitutional decisions not be made, whichever way they would come out. It is expressed in a large variety of rules, a few of which are listed in one Supreme Court decision:
constitutional issues affecting legislation will not be determined in friendly, nonadversary proceedings; in advance of the necessity of deciding them; in broader terms than are required by the precise facts to which the ruling is to be applied; if the record presents some other ground upon which the case may he disposed of; at the instance of one who fails to show that he is injured by the statute’s operation, or who has availed himself of its benefits; or if a construction of the statute is fairly possible by which the question may be avoided.
Rescue Army v. Mun. Court of Los Angeles, 331 U.S. 549, 569, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947) (emphasis added).

. Cf. Fine, 529 F.2d at 71, 76 (2d Cir.1975) (declining to decide the "difficult and troublesome constitutional questions” in a Bivenslike claim against a municipality "founded directly upon the Fourteenth Amendment”); Brault v. Town of Milton, 527 F.2d 730, 738 (2d Cir.1975) (en banc) (assuming, without *632 deciding, that a claim against a municipality "can be founded directly on the Fourteenth Amendment,” but finding "discussion of other possible barriers on [the plaintiff's] road to relief ... superfluous” because the allegations in the complaint were insufficient).

. For this reason, were there a majority finding that Arar could bring a TVPA action, as Judge Pooler, in her dissenting opinion, powerfully argues he should be able to do, then of course there might well be an "alternative, existing process,” Wilkie, 551 U.S. at 550, 127 S.Ct. 2588, in which case a Bivens action might not lie under the well-established rule that such a remedial scheme may obviate the need for a Bivens action. Because of the majority's holding that the TVPA does not apply, however, I need not reach this question. A more complicated issue, which I also don't need to reach, is whether compensation by a foreign government can constitute an alternative redress, because of which, on the very particular facts of this case, a Bivens action might not lie. But no one has discussed or argued that in any way, and since it is not an easy issue, I see no need to delve into it further.

. The first step of the two-part analysis laid out in Wilkie is itself an instance of constitutional avoidance. Where a congressionally created process adequately protects a constitutional right, there is no need to determine whether the Constitution requires a remedy. See Bush v. Lucas, 462 U.S. 367, 378 n. 14, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) ("We need not reach the question whether the Constitution itself requires a judicially fashioned damages remedy in the absence of any other remedy to vindicate the underlying right, unless there is an express textual command to the contrary. The existing civil service remedies for a demotion in retaliation for protected speech are clearly constitutionally adequate.” (citation omitted)).
By contrast, the Supreme Court, acting prudentially, has denied Bivens claims due to "special factors” only in quite particular circumstances implicating substantial constitutional questions. First, it has done so in response to an exclusive textual commitment of authority to another branch. See United States v. Stanley, 483 U.S. 669, 681-82, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987) (holding that no Bivens action lay because of "explicit constitutional authorization for Congress 'to make Rules for the Government and Regulation of the land and naval Forces' ” and "the insistence ... with which the Constitution confers authority over the Army, Navy, and militia upon the political branches” (quoting U.S. Const. art. I, § 8, cl. 14)); Chappell v. Wallace, 462 U.S. 296, 300-02, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (same); cf. Davis v. Passman, 442 U.S. 228, 246, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) ("[Although a suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation, we hold that these concerns are coextensive with the protections afforded by the Speech or Debate Clause.”). Second, it has done so where the Constitution did not provide a workable standard for distinguishing constitutional conduct from unconstitutional conduct. See Wilkie, 551 U.S. at 555-61, 127 S.Ct. 2588.

. While the methodology that courts apply in determining whether or not a constitutional *633 right presupposes some implied remedy is that of "a common-law tribunal,” Bush, 462 U.S. at 378, 103 S.Ct. 2404, that fact in no way diminishes the status of the ultimate holding, up or down, as a constitutional interpretation.
And while there are, of course, situations in which a court must or should put aside the practice of avoiding constitutional questions, as when its jurisdiction under Article III is in doubt, see Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), none of them apply here. The existence vel non of a Bivens action is not a jurisdictional prerequisite that must be resolved first. If this was ever in doubt, it has been resolved by Ashcroft v. Iqbal, - U.S. -, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009), which makes clear that a court can "assume, without deciding, that [a] claim is actionable under Bivens " and then dismiss a case on non-jurisdictional grounds.

. To be sure, the Supreme Court noted that the defendants in Harbury "did not challenge below the existence of a cause of action under Bivens," and accordingly it did not express an opinion on the question or use the "special factors” terminology. Harbury, 536 U.S. at 412 n. 6, 122 S.Ct. 2179. But the constitutional question before us, of the balancing of two constitutional interests, one an individual right and one a matter of national security and separation of powers, is the same one as was avoided in Harbury. *634 traordinary degree of willfulness and activism.

. At footnote 7, the majority disputes Judge Pooler’s statement that the propositions in the accompanying text are dicta. See Maj. Op. at 574. The majority then seeks to characterize those propositions as holdings. But whether something is holding or dicta is an objective fact and does not depend on how it is characterized either by a majority or by a dissent. It is what it is regardless of what one calls it. To paraphrase my professor Fleming James, "You can call it Thucydides or you can call it mustard plaster, but it is [dicta or holding] just the same.”
The fact that the majority wishes to call the propositions holding is instructive, however. If the propositions are holding then they would eliminate virtually all Bivens actions in this circuit. And they would do so despite the assertions, elsewhere in the majority opinion, that recognizing a Bivens action in this extraordinary case would be uniquely dangerous. The majority's desire to make a "holding” of such breadth, as to a question entailing constitutional interpretation, in a case which, as I argue, could likely be resolved on other grounds, displays a truly ex-

. At footnote 14, the majority states that the state secrets privilege, despite its common law origin, is not devoid of constitutional implications. See Maj. Op. at 603-04. That may well be. But that fact in no way means that decisions as to the applicability of a particular claim of the privilege entail constitutional interpretations. The existing common law privilege more than covers whatever the Constitution requires. The proper analogy is quite simple. If Congress were to pass a statute, akin to § 1983, giving broad cause of action to those injured by federal officials, decisions under that statute would not normally involve constitutional interpretations. And this would be so even though, in the absence of such a statute, a Bivens, constitutional claim, might lie. The same is so with respect to applications of the common law state secrets privilege. As an excuse for the majority's violation of the canon of constitutional avoidance this argument does not make it to first base.

. Indeed, if anything, existing doctrine may be too solicitous of the need for secrecy, if the many critics of the Reynolds line are correct. See infra Part IV. But while there is widespread concern that the doctrine may be overused, it is hard to find any commentators who think that state secrets are inadequately protected under current law.

. That is, except to the extent "state secrets" are involved. And to the extent they are, as already discussed, the state secrets privilege is more than sufficient to preclude graymail.

. On the subject of graymail, something must be said in response to the majority’s remarkable insinuation that Canada has been the victim of graymail at Arar's hands. Maj. Op. at 580-81. ("It is not for nothing that Canada (the government, not an individual officer of it) paid Arar $10 million dollars.”). The Canadian government decided on its own accord to initiate an inquiry into its role in Arar’s treatment, an investigation that operated independently of Arar’s suits. That inquiry was "specifically precluded from making any findings (or even assessments) as to whether the Government of Canada would be civilly liable to Mr. Arar.” Report of the Events Relating to Maher Arar: Analysis & Recommendations, Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar 362 (Sept. 18, 2006). It had no power to recommend payment, but instead just expressed the facts surrounding Arar’s treatment, spelling out Canada’s conduct vis-á-vis Arar in hundreds of pages of detail. The Canadian government considered that report and decided to compensate and apologize to Arar. In other words, Canada voluntarily established a commission the entire purpose of which was to determine and discuss publicly what the Canadian government did to Arar; it then assessed those facts and concluded that it should negotiate a settlement with him and formally apologize for the role of Canadian officials. Many lessons could be drawn from *637 this process for the American response to allegations like Arar’s, but one thing quite clearly cannot be said: that what happened in Canada is tantamount to graymail.

. My fellow dissenters have said all that needs to be said about the majority’s insistence that Arar’s action is "a constitutional challenge to policies promulgated by the executive” and that Bivens actions cannot proceed where they "affect diplomacy, foreign policy and the security of the nation.” Maj. Op. at 574. And as to the ominous-sounding warning that "[sjuch a suit unavoidably influences government policy” and “invades government interests,” Maj. Op. at 574, I would not think that an unconstitutional course of government action is shielded from scrutiny merely because it can be described as a “policy” or "interest.” If the DEA had a "policy” of conducting warrantless home searches, would we hesitate to influence it? See Bivens, 403 U.S. at 389-90, 91 S.Ct. 1999. If corrections officials acted on an "interest” in denying their inmates medical care, would we hesitate to invade it? See Carlson v. Green, 446 U.S. 14, 16, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

. The fact that a claim involves an open and plausible constitutional question should be no bar to a state secrets ruling. As in Iqbal, a court can simply "assume, without deciding, that [plaintiff’s Bivens] claim is actionable” and determine whether a case must be dismissed even on the legal theory most favorable to the plaintiff. Iqbal, 129 S.Ct. at 1948.

. At oral argument, however, the Government did indicate that it could accept such a remand.

. Consider the closing remarks of Judge Ellis in his state secrets dismissal of Khaled ElMasri's similar allegations:
It is important to emphasize that the result reached here is required by settled, controlling law. It is in no way an adjudication of, or comment on, the merit or lack of merit of El-Masri’s complaint.... [Pjutting aside all the legal issues, if El-Masri’s allegations are true or essentially true, then all fair-minded people, including those who believe that state secrets must be protected, that this lawsuit cannot proceed, and that renditions are a necessary step to take in this war, must also agree that El-Masri has suffered injuries as a result of our country’s mistake and deserves a remedy. Yet, it is also clear from the result reached here that the only sources of that remedy must be the Executive Branch or the Legislative Branch, not the Judicial Branch.
*639 El-Masri v. Tenet, 437 F.Supp.2d 530, 540-41 (E.D.Va.2006).