# District of Columbia Court of Appeals



F I L E D
MAY 13 2021

**Nos. 21-CV-34, 21-CV-35, 21-CV-36, 21-CV-37 & 21-CV-38**

DISTRICT OF COLUMBIA,  
              Appellant,

v.

KAREN TOWERS, *et al.*,  
              Appellees.

2020 LTB 6315, 2020 LTB 6637  
2020 LTB 6770, 2020 LTB 8032  
2020 LTB 8107

BEFORE: BECKWITH and EASTERLY, *Associate Judges*, and FISHER, *Senior Judge.*[*]

## PUBLISHED ORDER

The District of Columbia is seeking review of the trial court's Declaratory Judgment that the statutory moratorium on filing a complaint seeking a judgment of possession during a public health emergency violates property owners' constitutional right to access the courts. While the appeal is pending, the District requests that this court stay the trial court's order. For the reasons set forth below, we grant the motion for a stay pending appeal.

## I. Background

On March 11, 2020, the same day the World Health Organization declared COVID-19 a pandemic,[1] the Mayor of the District of Columbia, acting pursuant to her powers under the Home Rule Act,[2] issued a declaration of a public health

---

[*] Per his statement below, Judge Fisher concurs in the decision to grant the motions at issue.

[1] *Timeline: WHO's COVID-19 Response*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019/interactive-timeline https://perma.cc/5S39-HEHB (last visited May 6, 2021).

[2] D.C. Code § 1-204.22(11) (2016 Repl.).

emergency.[3]  The Mayor explained that "[t]here is reasonable cause to believe that there is an imminent hazard of or actual occurrence of widespread exposure to an infectious agent (COVID-19) that poses a significant risk of substantial future harm to a large number of people in the District of Columbia," and that "[t]he spread of COVID-19 is an imminent threat to the health, safety, and welfare of District residents that requires emergency protective actions be undertaken by the District Government."[4]  The COVID-19 public health emergency is ongoing.  As of May 6, 2021 there have been more than 48,000 COVID-19 cases in the District and over 1,100 deaths.[5]

The declaration of a public health emergency by the Mayor triggered a progression of legislative responses by the Council of the District of Columbia to protect residents from losing their housing or even facing the prospect of losing their housing.  On March 17, the Council enacted, as part of the COVID-19 Response Emergency Amendment Act of 2020, a moratorium on evictions "[d]uring a period of time for which the Mayor has declared a public health emergency" ("the eviction moratorium").[6]  Two months later, on May 13, the Council enacted, as part of the

---

[3] *Mayor's Order 2020-45: Declaration of Public Health Emergency – Coronavirus (COVID-19)*, Executive Office of the Mayor (March 11, 2020), https://mayor.dc.gov/release/mayor's-order-2020-045-declaration-public-health-emergency-coronavirus-covid-19 https://perma.cc/VBY9-9PME.

[4] *Mayor's Order 2020-46: Declaration of Public Health Emergency – Coronavirus*, Executive Office of the Mayor (March 11, 2020), https://mayor.dc.gov/release/mayor's-order-2020-046-declaration-public-health-emergency-coronavirus-covid-19 https://perma.cc/2BLY-DG5Q.

[5] *COVID-19 Surveillance*, Gov't of the District of Columbia, Muriel Bowser, Mayor, https://coronavirus.dc.gov/data https://perma.cc/K6LW-49MZ (last visited May 6, 2021).

[6] *See* D.C. Act 23-247 § 308, 67 D.C. Reg 3093 (Mar. 17, 2020); D.C. Code § 42-3505.01(k)(3) (2020 Repl.).  Meanwhile Congress enacted a temporary federal moratorium on eviction filing as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), *see* 15 U.S.C. § 9058(b).  After this moratorium expired in July 2020, the Centers for Disease Control and Prevention ("CDC") ordered a nationwide temporary federal moratorium on evictions, *see* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed.

Coronavirus Omnibus Emergency Amendment Act of 2020, the moratorium that is the subject of this case, disallowing the filing of "a complaint" for a judgment of possession "[d]uring a period of time for which the Mayor has declared a public health emergency . . . and for 60 days thereafter" ("the filing moratorium").[7]  By virtue of making this Act effective as of March 11, 2020, the Council made the component filing moratorium retroactive to that date.  *See* D.C. Act 23–317 § 29. On October 14, the Council enacted, as part of the Eviction Notice Moratorium Emergency Amendment Act of 2020, provisions disallowing housing providers from issuing notices to vacate to their tenants[8] and prohibiting them from "[e]ngag[ing] in any action that is intended to force tenants to leave their housing or otherwise give up their rights under the law."[9]  And in November, the Council enacted legislation requiring housing providers to issue both notices to vacate and notices of the providers' intent to file a claim to tenants before filing any type of claim for a judgment of possession.[10]  Although these provisions were enacted pursuant to emergency or temporary legislation, they have been extended and are in effect at the time of this order.[11]

---

Reg. 55,292 (Sept. 4, 2020).  But the CDC order, which was issued in September 2020 and has been extended several times, *see* Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 16,731 (Mar. 31, 2021), does not apply in jurisdictions, like the District, which have provided the same or greater protections against eviction during the pandemic.  *See id.* at 16,736.

[7] *See* D.C. Act 23–317 § 10, 67 D.C. Reg. 5235 (May 13, 2020); D.C. Code § 16-1501(b) (2012 Repl.).

[8] *See* D.C. Act 23-415 § 2, 67 D.C. Reg. 12243 (Oct. 14, 2020); D.C. Code § 42-3505.01(q)(1)(A).  Generally, a property owner must serve a tenant with a notice to vacate before they may file a complaint seeking a judgment of possession.  *See* § 42-3505.01(a).

[9] *See* D.C. Act 23-415 § 2; D.C. Code 42-3505.01(q)(1)(B).

[10] *See* Fairness in Renting Temporary Amendment Act of 2020, D.C. Act 23-499 § 2, 67 D.C. Reg. 13959 (Nov. 18, 2020); D.C. Code § 42-3505.01(a), (a-1)(1).

[11] *See* Coronavirus Support Emergency Amendment Act of 2021, D.C. Act 24-30 § 404, 68 D.C. Reg. 003101 (Mar. 17, 2021); Fairness in Renting

4

In the meantime, the District of Columbia courts had to craft their own response to the pandemic. *See Sharps v. United States*, No. 20-CO-554, 2021 WL 922468, at *1 (D.C. Mar. 11, 2021) (explaining that "the Superior Court's normal operations" were "severely disrupted" by the pandemic). The Superior Court continued all scheduled hearings in the vast majority of case types, including suits for possession of residential property in the Civil Division.[12] *See* Order Further Reducing D.C. Superior Court Operations (Mar. 18, 2020). Over the next several months, the court created a new system to conduct remote court proceedings that were intended to be both accessible to the parties and open to the public. By July, the Civil Division was in a position to be able to address the hundreds of pending complaints for possession that had been filed in the Landlord and Tenant Branch after the declaration of a public health emergency (many of these complaints were filed before the filing moratorium was enacted, but for reasons that are unexplained in the record of this case, some number were permitted to be filed after).

The Presiding Judge of the Civil Division directed the trial court to adjudicate all questions of law relating to the filing moratorium common to any eviction case filed on or after March 11, 2020, in the Landlord and Tenant Branch. *See* General Order Concerning Landlord and Tenant Cases Filed On or After March 11, 2020 (July 28, 2020). The trial court selected five cases filed between March and September 2020 to consider facial challenges to the legality of the filing moratorium. The cases involved (1) a foreclosed homeowner, (2) an individual who allegedly continued to reside at the property after the leaseholder vacated, (3) a tenant who allegedly failed to pay rent in the month of March, (4) a tenant alleged to be "maintaining a drug haven as defined by D.C. Code 42-3602" and who allegedly violated the terms of the lease by engaging in illegal drug activity on or near the premises, and (5) a tenant alleged to be maintaining a drug haven on the premises.[13]

Congressional Review Temporary Amendment Act of 2021, D.C. Law 23-255 § 2, 67 D.C. Reg. 13959 (Mar. 16, 2021).

[12] These case types comprise suits for possession where the defendant is not a tenant in rental housing, including cases where the defendant is a squatter or a holdover in a property that has been foreclosed upon. For ease of reference, we refer to all defendants in these cases as "tenants."

[13] We do not address in this order whether the filing moratorium under D.C. Code § 16-1501(b) in fact applies to all of these types of cases. *See* D.C. Code § 42-

The property owners in these cases raised a number of challenges to the filing moratorium, including:

- Whether the filing moratorium violates D.C. Code § 1-204 (2016 Repl.), which prohibits the District from passing any law that would violate the Contracts Clause if it were passed by a state.

- Whether the filing moratorium violates separation of powers principles or Title 11 of the Home Rule Act, D.C. Code § 1-204.22.

- Whether the filing moratorium constitutes a taking that entitles landlords to just compensation.

- Whether the repeal and expiration of the emergency acts that contained the filing moratorium and had an applicability date of March 11, 2020, means that the filing moratorium is currently applicable only to eviction cases filed on or after the applicability date of the current temporary act containing the eviction moratorium, and

- Whether the filing moratorium imposes a "penalty, forfeiture, or liability" within the meaning of the savings clauses in D.C. and federal codes.

Ultimately, however, the trial court determined that it did not need to reach these claims.

Instead the trial court focused on the property owners' claim that the filing moratorium violated their "fundamental right of access to the courts." The court determined that "[t]he United States Constitution protects the right of property owners to go to court to regain possession of their property in a summary proceeding," any infringement on this "time-sensitive" right was subject to intermediate scrutiny, and the filing moratorium did not survive such review. Accordingly, the trial court issued a declaratory judgment that the filing moratorium

---

3602(a) (2020 Repl.). Nor do we express any opinion whether the exceptions to the eviction moratorium, *see* D.C. Code § 42-3505.01(k-1), have any application to the filing moratorium, or whether the separate statutory moratorium on debt collection activity, *see* D.C. Act 24-30 § 303; D.C. Code § 28-3814(b)(l)–(2) (2013 Repl.), precludes property owners from pursuing claims for unpaid rent.

was unconstitutional and directed the clerk to "schedule initial hearings in any pending case filed on or after March 11, 2020, as soon as reasonably possible."

After the trial court issued its declaratory judgment, the District filed a timely notice of appeal and then moved for a stay of the trial court's order pending litigation of its appeal, first from the trial court and then from this court. We entered an administrative stay to allow this motion to be litigated, and now that the trial court has denied the motion for a stay pending appeal, we consider whether a stay should issue.[14]

## II.   Analysis

In assessing whether to grant an appellant's motion for a stay pending appeal we consider four factors: whether the appellant is likely to succeed on the merits of the appeal; whether the appellant is in danger of suffering irreparable harm if the stay is denied; whether the opposing party is likely to suffer harm if the stay is granted or the balance of harms weighs in favor of a stay; and whether the public interest favors the granting of a stay. *See District of Columbia v. Reid*, 104 A.3d 859, 865 (D.C. 2014); *Barry v. Washington Post Co.*, 529 A.2d 319, 320–21 (D.C. 1987). These factors "interrelate on a sliding scale" such that a stronger showing of a likelihood of success may compensate for a weaker showing on the other factors and vice versa. *Salvaterra v. Ramirez*, 105 A3d 1003, 1005 (D.C. 2014) (internal quotation marks omitted). Further, where a case presents "a serious legal question" and "when there is little risk of harm to the other parties or to the public interest," "[a]n order maintaining the *status quo* may be appropriate." *Walter E. Lynch & Co., Inc. v. Fuisz*, 862 A.2d 929, 932 (D.C. 2004).

---

[14] After the parties filed their pleadings regarding the motion for a stay pending appeal, the Council enacted new legislation allowing the eviction process to proceed under narrow circumstances to ensure the health and safety of people in residential communities. *See* Eviction Moratorium Public Safety Exception Emergency Amendment Act of 2021, D.C. Act 24-67 § 2 (May 3, 2021). Because the filing moratorium as initially enacted seems not to implicate the right to access the courts, *see infra* Part II.1, our analysis of the propriety of a stay does not turn on this newly enacted legislation limiting the filing moratorium.

## 1. Likelihood of Success

The District argues that it is likely to succeed on appeal because the filing moratorium does not implicate the right of access to the courts. The District appears to have a strong argument.

The exact foundation for the right of access to the courts is unsettled. At different times, the Supreme Court has grounded this right in the Privileges and Immunities Clause of Article IV, the Petition Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clauses of the Fifth and Fourteenth Amendments. *See Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002). But at least one thing is clear: the right of access is "ancillary to the underlying claim" sought to be litigated, "without which a plaintiff cannot have suffered injury by being shut out of court." *Id*. at 415; *see also id*. at 414–15 (explaining "the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong"). In other words, in order to raise a right to access claim, an individual must have a separate legal claim to litigate. Thus, for example, where a class of putative plaintiffs could not afford to pay court fees to pursue an otherwise viable cause of action (divorce), the Supreme Court held their right of access to the courts was violated. *Boddie v. Connecticut*, 401 U.S. 371, 374 (1971). Similarly, the Supreme Court held that the denial of an adequate law library violated prisoners right of access to the courts because it deprived them of "[t]he tools . . . [they] need[ed] in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Lewis v. Casey*, 518 U.S. 343, 355 (1996).

Here the trial court concluded that appellees' right of access to the courts was violated because, by virtue of an amendment to D.C. Code § 16-1501, they were temporarily barred from filing complaints for a judgment of possession thereunder. But claims for a judgment of possession and eviction in the District are defined exclusively and precisely by statute.[15] Having been defined by the legislature, these

---

[15] *See Mendes v. Johnson*, 389 A.2d 781, 787 (D.C. 1978) (en banc) ("[T]he landlord's common law right of self-help has been abrogated, and the legislatively created remedies for reacquiring possession are exclusive. A tenant has a right not

claims can likewise be constricted.[16] Claims for possession and eviction are already subject to a litany of procedural limitations designed to give tenants a full and meaningful opportunity to defend themselves and maintain their housing.[17] The additional limitation of a filing moratorium for these types of claims during a pandemic does not appear to implicate the right of access to the courts any more than, for example, requiring the filing of a notice to vacate before allowing the filing of a complaint for a judgment of possession. Although both provisions inject delay into the process, they are simply part of the procedural fabric of our eviction statute.[18] *See Sosna v. Iowa*, 419 U.S. 393, 410 (1975) (upholding a one-year

---

to have his or her possession interfered with except by lawful process, and violation of that right gives rise to a cause of action in tort.").

[16] *Cf. Pennell v. City of San Jose*, 485 U.S. 1, 12 n.6 (1988) ("States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular . . . ." (internal quotation marks omitted)); *Hornstein v. Barry*, 560 A.2d 530, 533–34 (D.C. 1989) (en banc) ("Laws adjusting the burdens and benefits of economic life come to the courts with a presumption of constitutionality . . . .").

[17] Of course, a property owner's hands are not completely tied by the statutory scheme limiting their ability to go to court to recoup their rent or reclaim their property from a tenant. They may always attempt to negotiate with the tenant directly. *Cf. United States v. Kras*, 409 U.S. 434, 445 (1973) (explaining that "bankruptcy is not the only method available to a debtor for the adjustment of his legal relationship with his creditors" because "[h]owever unrealistic the remedy may be in a particular situation, a debtor, in theory, and often in actuality, may adjust his debts by negotiated agreement with his creditors").

[18] It is immaterial that some provisions of our eviction laws that delay relief have definite time periods measured in an exact number of days. *See, e.g.*, D.C. Code § 42-3505.01(b) (giving tenants 30 days to cure a violation of an obligation of tenancy). Not all procedural delays are so precisely quantifiable. *See, e.g.*, D.C. Code § 42-3505.01(k)(1), (2) (disallowing evictions, subject to some exceptions, on days when the temperature is below freezing or when it is precipitating). In any event, the filing moratorium also has a definite end: it will be lifted "when the [public health] emergency ends, or is overcome. Even if there may be uncertainty

residency requirement for divorce on the ground that it merely delayed the cause of action and distinguishing *Boddie* where "[t]he operation of the filing fee . . . served to exclude forever a certain segment of the population from obtaining a divorce in the courts of Connecticut").

We question the trial court's determination that the landlords' right to access claim was ancillary to a claim under "[t]he United States Constitution [that] protects the right of property owners to go to court to regain possession of their property in a summary proceeding," a right the court described as "time sensitive." To be sure, property owners have rights that are protected by various constitutional provisions, but we are unaware that there is a constitutional right to evictions on a particular timetable, notwithstanding prior descriptions in our cases of landlord-tenant proceedings as "summary in nature." *Mahdi v. Poretsky Management*, 433 A.2d 1085, 1088 (D.C. 1981); *but cf. Hornstein*, 560 A.2d at 532 & n.3 (describing "comprehensive scheme of regulation [including eviction controls] designed to protect the rights of tenants, particularly poor and elderly tenants who, in the Council's reasonable view, merit and need such protection" (footnote omitted)).

In assessing the likelihood of the District's success on appeal, we have also surveyed the country to see how right of access challenges to pandemic-related filing moratoriums in other jurisdictions have fared. At least ten other states and a number of other localities have enacted filing moratoriums for eviction suits during the pandemic.[19] Yet the trial court's decision striking down similar legislation on the

---

as to when that will happen, the statutory premise is that it *will* happen in the foreseeable future . . . ." *Sharps*, 2021 WL 922468, at *10.

[19] In addition to the District, California, Connecticut, Hawaii, Illinois, Minnesota, Nevada, New York, Oregon, Vermont, and Washington currently have filing moratoriums in place. *See Covid-19 Housing Policy Scorecard*, Eviction Lab, Princeton University, https://evictionlab.org/covid-policy-scorecard/ https://perma.cc/8AGD-KXUF (last visited May 6, 2021). Massachusetts had a filing moratorium that expired on October 17, 2020. *Expiration of Moratorium on Evictions and Foreclosures*, https://www.mass.gov/info-details/expiration-of-moratorium-on-evictions-and-foreclosures https://perma.cc/795C-QF27 (last visited May 6, 2021). Several localities also imposed notice and filing moratoriums at the beginning of the pandemic that have since been lifted. *See Preliminary Analysis:*

ground that it violates the right of access to the courts stands alone. By contrast, at least two other federal trial courts have determined that such a constitutional challenge is meritless or unlikely to succeed. *See, e.g.*, *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 393–94 (D. Mass. 2020); *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 174 (S.D.N.Y. 2020).

This is not to say that the filing moratorium could not be challenged on other grounds. *But see Baptiste*, 490 F. Supp. 3d at 369–71 (finding landlords not reasonably likely to prevail on claims that filing moratorium violates their rights under the Contracts Clause, Takings Clause, and First Amendment); *Elmsford Apartment Assocs., LLC*, 469 F. Supp. 3d at 155–56 (rejecting landlords' claims that filing moratorium violates their rights under the Contracts Clause, Takings Clause, and Due Process Clause). But because the trial court limited its analysis to a determination that the filing moratorium violated the right of access to the courts, our focus is on whether the District's challenge to that analysis has a likelihood of success. It appears that it does.[20]

---

*Eviction Filings During and After Local Eviction Moratoria*, Eviction Lab, Princeton University (Nov. 15, 2020), https://evictionlab.org/moratoria-and-filings/ https://perma.cc/M47M-7253.

[20] Even assuming that the right of access is implicated by the filing moratorium, it is not at all clear that legislation compromising the right of access to the courts to regain possession of one's property from a tenant is subject to intermediate scrutiny. *See generally* Ronald D. Rotunda & John E. Nowak, 3 Treatise on Const. L. § 17.10 (May 2020) ("Where access to the judicial process is not essential to the exercise of fundamental constitutional rights the state will be free to allocate access to the judicial machinery on any system or classification which is not totally arbitrary."). In any event, there is a strong argument that the filing moratorium survives intermediate scrutiny because, as discussed further below, it is substantially related to one or more important governmental objectives, *see Brown v. United States*, 979 A.2d 630, 641 (D.C. 2009), namely, ensuring people can retain their housing, shelter in place, and avoid spreading the COVID-19 virus. *Cf. Baptiste*, 490 F. Supp. 3d at 394 ("Preventing the spread of an epidemic is a legitimate state interest.").

## 2. Danger of Irreparable Harm to Tenants

The District has adequately demonstrated that, without a stay, there is risk of irreparable harm to the defendants from the property owners' suits for possession should the property owners be permitted to file them. Although the eviction moratorium has not been challenged, the District argues that there is still the danger that tenants will self-evict—that is, out of fear, misunderstanding, or a lack of resources to fight eviction, they will move out of their homes simply as a result of being made a defendant to a suit for possession. "The upheaval of a tenant from his home, even if he can find alternative housing, creates a cognizable irreparable injury." *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 309 (D.C. 2006). It is not fatal to its argument that the District cannot supply hard numbers to show that the absence of a stay would cause self-eviction on a mass scale, or that some number of tenants have been successfully advised of their rights. The District need only show that tenants are in some "danger of suffering irreparable harm" that, when considered in conjunction with the other stay factors, justifies temporary equitable relief. *Reid*, 104 A.3d at 876–77 (internal quotation marks omitted) (rejecting the argument that families experiencing homelessness had failed to present sufficient evidence of irreparable harm as a result of being housed in congregate shelters); *cf. Akassy*, 891 A.2d at 310 (explaining that "if irreparable harm is clearly shown, the movant may prevail by demonstrating that he or she has a 'substantial case on the merits'"). Given that the vast majority of tenants who appear in Landlord Tenant Court "cannot afford counsel and are unable to obtain free representation from the District's oversubscribed legal services providers," *Wylie v. Glenncrest*, 143 A.3d 73, 84 (D.C. 2016),[21] we conclude that there is a real danger of self-

---

[21] With the benefit of money appropriated by the Council for eviction defense, it appeared the representation numbers were slightly improving just before the pandemic hit: 75% of tenants in Landlord Tenant Court did not have a lawyer, down from 88% in 2017. *See* Sarah Hainbach, *Who Deserves a Lawyer? The Case for a Right to Counsel in Housing Proceedings*, Blog, Geo. J. on Poverty L. & Pol'y (Jan. 28, 2020), https://www.law.georgetown.edu/poverty-journal/blog/who-deserves-a-lawyer-the-case-for-a-right-to-counsel-in-housing-proceedings/ https://perma.cc/BK8H-3TJ8; *Delivering Justice: Addressing Civil Legal Needs in the District of Columbia*, D.C. Access to Justice Comm'n 4 (2019).

eviction as a result of allowing property owners to file and litigate suits for possession in Superior Court.[22]

Beyond the risk of self-eviction, there is also the concern that tenants will be unable to litigate their cases effectively during the public health emergency for any number of reasons: for example, a tenant may be sick, or caring for someone who is sick, or caring for children who are out of school; or a tenant may lack access to a home computer or a reliable internet connection needed to access forms or other case-related information online, conduct research, or attend a remote hearing;[23] or a tenant may be unable to amass their proof or seek out counsel to contest the allegations being made against them or establish defenses.

And, perhaps most importantly, for those tenants who have failed to pay their rent, there is the loss of the extended opportunity to cure. The federal and district governments have made and continue to make efforts to provide various forms of assistance to people in need during this public health emergency to help them survive until the pandemic abates and the economy rebounds. In addition to other rental and

---

[22] As amici in support of the District's motion for a stay pending appeal argue, even the individuals who withstand the pressure to self-evict when faced with a complaint for possession may suffer emotional harm in the form of heightened anxiety and depression. The trial court dismissed this harm argument on the ground that it had not been given "substantial evidence . . . that the filing of a lawsuit significantly increases the emotional distress that tenants or other occupants at risk of eviction already experience." But it is self-evident that the initiation of court proceedings to force an individual or a family out of their home during a pandemic would cause significant emotional harm.

[23] Recognizing the technological difficulties individuals may face in accessing remote hearings, the D.C. Courts have set up five sites in all four quadrants of the District where individuals can reserve a computer station to attend a remote hearing. *See D.C. Superior Court Opens 5 Locations for Wifi, Computer Access*, Child Support Servs. Div., Off. of the Attorney General for the District of Columbia (Sept. 18, 2020), https://cssd.dc.gov/release/dc-superior-court-opens-5-locations-wifi-computer-access https://perma.cc/K4H3-5PA4.

mortgage assistance programs,[24] in early April, the Mayor announced a $350 million assistance program, Stronger Together by Assisting You (STAY DC), to fund grants for D.C. residents for up to eighteen months to pay missed rent and utility bills dating back to April 1, 2020, as well as upcoming rent and utility expenses. *See Stay DC*, Gov't of the District of Columbia, Muriel Bowser, Mayor, https://stay.dc.gov https://perma.cc/UUM5-8FFV (last visited May 6, 2021).[25] Landlords may initiate applications for their qualifying tenants. *Id*. Meanwhile the economy appears to be recovering and employers are adding employees.[26] With additional time, once assistance is received or a job is regained, tenants may be able to avoid losing their homes. A central aim of a filing moratorium, after all, is not simply to stave off the inevitable; it is to give tenants time to stabilize and avoid displacement.[27]

### 3. Balancing Harm to Property Owners

Balancing the harm to property owners if a stay pending appeal is granted also favors issuance of a stay. Because the eviction moratorium has not been challenged, a stay of the trial court's order invalidating the filing moratorium will have no effect on the owners' ability to regain immediate possession of the subject property.

---

[24] *See Housing Resources*, Gov't of the District of Columbia, Muriel Bowser, Mayor, https://coronavirus.dc.gov/rent https://perma.cc/B3MW-JPXW (last visited May 6, 2021).

[25] *See* Kyle Swenson, *D.C. Announces $350 Million Program to Help Residents Pay Rent and Utility Bills*, Wash. Post (Apr. 12, 2021, 4:07 p.m.), https://www.washingtonpost.com/dc-md-va/2021/04/12/dc-rent-relief/ https://perma.cc/XE7V-AE4A.

[26] *See DC Unemployment Rate at 7.8 Percent in March*, D.C. Dep't of Emp't Servs. (Apr. 19, 2021), https://does.dc.gov/release/dc-unemployment-rate-78-percent-march-0 https://perma.cc/DXC4-AF2Q.

[27] The trial court's observation that many individuals protected by the filing moratorium were facing financial hardship before the pandemic simply underscores the need to afford these individuals time to take advantage of the new forms of assistance that are now available.

The property owners appear to take the position that they would nevertheless be harmed by a stay because they are in fact entitled to judgments of possession and a stay keeping the filing moratorium in place would impede them from establishing that now and then quickly obtaining writs of restitution when the eviction moratorium is lifted. This delay is not a cognizable harm, however, because it is unclear that when the eviction moratorium lifts these landlords will be entitled to evictions. Not only is it possible that some of their claims are currently unfounded, events may transpire between now and then that defeat or moot out certain claims. Again, the whole point of the filing moratorium is to give tenants additional time to stabilize so that eviction is no longer warranted when the eviction moratorium is lifted—not to create a new public health emergency in the form of a tidal wave of evictions at a later point in time.

The landlords also argue that they will be harmed by a stay because, if they cannot initiate a suit for possession, they cannot ask the court to direct a tenant, via a protective order or undertaking order, to make payments into the court registry during the pendency of that litigation. *See Penny v. Penny*, 565 A.2d 587, 591 (D.C. 1989). Such orders are generally not issued in cases where a property owner seeks a judgment of possession for reasons besides nonpayment of rent, as the trial court acknowledged, because of the unfair burden it places on tenants' ability to defend their right to remain in their homes. *See* Super. Ct. L&T R. 12-I (a)(1)(C) (imposing special limits on the issuance of protective orders in nonpayment of rent cases); *see also Bell v. Tsintolas Realty Co.*, 430 F.2d 474, 479–80 (D.C. Cir. 1970) (explaining that requiring tenants to provide security to landlords pending litigation is contrary to "the ordinary processes of civil litigation, in which, as a general rule, the plaintiff has no advance assurance of the solvency of the defendant"). But even for the relevant subset of property owners seeking a judgment of possession entitled to a protective order, an order to pay money into the court registry does not translate into timely payment of the full monthly dollar value property owners assert is owed.

Tenants cannot pay into the court registry what they do not have, *see Graham v. Lanier Assocs.*, 19 A.3d 361, 367 (D.C. 2011) (explaining that the court must consider "a tenant's financial straits" in setting a protective order amount), so a property owner may suffer no loss from the inability to obtain a protective order. Assuming the tenant has some ability to pay, the amount to be paid is left to the trial court's discretion and turns on the consideration of a number of factors, including

the existence of any housing code violations reducing the value of the property. *See Bell*, 430 F.2d at 484–85; *Penny*, 565 A.2d at 591. Further, a "protective order does not dispose finally of the parties' right to the money paid under it," *Akassy*, 891 A.2d at 308, and there are strict limits on the disbursement of funds paid into the registry while the case is still pending:

> Where, but only where, the court can say with complete certainty that the landlord will become entitled to a definite part of the in-court fund in any event, and the landlord demonstrates convincingly so dire a need for that part as to persuade the court to exercise its equitable powers to afford him some relief, the court may, to just that extent, respond favorably to the landlord's request for disbursement from the deposited fund pendente lite. This rule contemplates, of course, that the competing claims of the parties will first be subjected to careful examination at a hearing after due notice, and that nonfrivolous claims of tenants to ultimate nonliability for any or all of the deposited monies will be scrupulously honored. And it goes without saying that the court's authority to order a turnover from the fund must be cautiously and sparingly utilized.

*Cooks v. Fowler*, 459 F.2d 1269, 1277 (D.C. Cir. 1971); *accord Stets v. Featherstone*, 754 A.2d 292, 296 (D.C. 2000) ("[W]here no genuine dispute exists regarding the landlord's entitlement to a portion of the rent due under the lease, equitable considerations may justify the L & T court in ordering *partial* release of the uncontested amounts from the registry . . . *pendente lite* . . . .").

While some subset of property owners might experience some harm by losing the opportunity to obtain a protective order or undertaking order requiring the tenant to pay likely some lesser monthly amount into the court registry, and then to seek partial disbursement of that amount while the case is pending, we cannot say the prospect of that harm shifts the balance of equities against the issuance of a stay pending appeal. Even as to these property owners, this harm does not appear to be "irreparable." "Mere injuries, however substantial, in terms of money . . . necessarily

expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim o[f] irreparable harm." *Zirkle v. District of Columbia*, 830 A.2d 1250, 1257 (D.C. 2003).

### 4. Public Interest

Lastly we conclude that the public interest favors the issuance of a stay pending appeal.

The filing moratorium is one component of the Council's comprehensive response to the COVID-19 public health emergency and its financial fallout. While the courts have an important role to play in ensuring that the District does not wield its police powers in an unconstitutional or illegal manner, we are not legislators elected to make difficult policy decisions with potentially life or death consequences. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring) ("When [elected] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad . . . [and] should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." (internal quotation marks, citation, and brackets omitted)). Proper understanding of our role, coupled with the fact that we are unaware of any other court anywhere in the country which has ruled that a moratorium on filing suit for eviction during a public health emergency violates the right of access to the courts, strongly weighs in favor of caution and a stay.

The public's interest in the fair administration of justice also weighs in favor of a stay. Pre-pandemic, almost all Superior Court proceedings were held in person and the vast majority were open to the public. It took months to recreate some measure of that accessibility and transparency remotely. The Superior Court is only just now recommencing jury trials in a limited number of criminal cases.[28] But the

---

[28] *See DC Courts' Pandemic Operations Information*, District of Columbia Courts, https://www.dccourts.gov/coronavirus https://perma.cc/3BRJ-ME3V (last visited May 6, 2021).

Civil Division continues to operate entirely remotely at a much-reduced capacity.[29] An estimated 500 eviction cases affected by the filing moratorium are currently pending; such an influx could pose a particular challenge for the court and litigants, again because the vast majority of tenants in these cases, by virtue of being poor and unrepresented, are more likely to have difficulty navigating a system where hearings are conducted remotely. The Superior Court, having already demonstrated its resilience, would do its best to manage. But there is a strong argument that it would be better for the public if the steps taken by elected officials to keep people in their homes and out of court were given time to work.

### III.   Conclusion

For the reasons discussed above, we conclude that a stay pending appeal is appropriate in this case.

Accordingly, it is

ORDERED that appellant's motion to supplement the motion for a stay pending appeal is granted. It is

FURTHER ORDERED that the motion filed by Bread for the City, the D.C. Bar Pro Bono Center, the Legal Aid Society of the District of Columbia, Legal Counsel for the Elderly, Neighborhood Legal Services Program, and Rising for Justice to appear as *amici curiae* in support of appellant's motion for a stay pending appeal is granted and the Clerk shall file their lodged brief. It is

FURTHER ORDERED that appellee Borger Management's motions for leave are granted and the Clerk shall file its lodged oppositions and responsive brief. It is

FURTHER ORDERED that the administrative stay entered by this court is hereby vacated and appellant's emergency motion to stay the trial court's December 16, 2020, order pending appeal is granted. It is

---

[29] *See id.*

18

FURTHER ORDERED, sua sponte, that the appeals shall be expedited and placed for consideration on the September 2021 regular calendar. It is

FURTHER ORDERED that appellant shall order the necessary transcripts on an expedited basis and within five days from the date of this order file a copy of the statement regarding transcripts with the court. It is

FURTHER ORDERED that appellant and *amici curiae* supporting appellant shall file their briefs and joint appendix no later than June 25, 2021; the briefs of appellees shall be filed no later than July 26, 2021; and appellant shall file its reply brief no later than August 10, 2021. It is

FURTHER ORDERED that the parties shall, no later June 30, 2021, notify the court of their September 2021 availability by emailing that information to CalendarClerk@dcappeals.gov. It is

FURTHER ORDERED that any attorney who has entered an appearance in these matters is reminded of this court's requirement to register for the court's efiling system. *See* D.C. App. R. 25(a)(2)(B)(ii).

**PER CURIAM**


FISHER, *Senior Judge*, concurring in the decision to grant the motions at issue: I do not join the lengthy opinion of the court. It is not our task to decide the merits of these appeals and the opinion says too much on that topic. In addition, considering that the moratorium on evictions is not affected by the trial court's order, the opinion gives too much credence to appellant's claim of irreparable harm and fails to recognize that the landlords suffer harm from the granting of a stay. But this is not an ordinary appeal, and I ultimately agree that a stay is warranted because the trial court has declared an act of the Council to be unconstitutional.

Copies mailed to:

Honorable Anthony Epstein

QMU – Civil Division

Abel Hernandez-Cruz
Fulgencio Cruz
1515 Ogden Street, NW, #608
Washington, D.C. 20010

Unknown Occupants
2832 27th Street, NE
Washington, D.C. 20018

Kendra Bryant
1607 D Street, NE
Washington, DC 20002

Andre Hopkins
912 Barnaby St. SE #103
Washington, DC 20032

Donna Butler
1840 Minnesota Avenue SE
#15
Washington, DC 20020

James Shelton
256 15th Street, SE
Washington, DC 20003

John O'Connor, Jr., Esquire
1330 Connecticut Avenue, NW
Washington, DC, 20036

Copies e-served to:

Loren L. AliKhan, Esquire
Solicitor General DC

Stephen O. Hessler, Esquire

Jennifer Friend-Kelly, Esquire

Gary D. Wright, Esquire

Morris R. Battino, Esquire

Aaron Sokolow, Esquire

Edward Cordone, Esquire

Vincent Policy, Esquire

Richard Luchs, Esquire

Cml